T.C. Memo. 2008-102

UNITED STATES TAX COURT

ROBERT L. SOLOMON AND DONNA J. SOLOMON, ET AL.,[1] Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20293-05, 20294-05,   Filed April 16, 2008.
            20295-05.


<u>Albert L. Grasso</u>, <u>Carri A. Conlon</u>, and <u>Joseph A. Zarlengo</u>,
for petitioners.

<u>Kathleen Schlenzig</u>, for respondent.

---

[1] Cases of the following petitioners are consolidated
herewith:  Solomon Colors, Inc., docket No. 20294-05; and Richard
R. Solomon and Gina G. Solomon, docket No. 20295-05.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  In these consolidated cases, petitioners petitioned the Court to redetermine the following Federal income tax deficiencies determined by respondent:

| Petitioner | Year | Deficiency |
|---|---|---|
| Robert L. Solomon and Donna J. Solomon | 2000 | $158,368 |
| Richard R. Solomon and Gina G. Solomon | 2000 | 44,031 |
| Solomon Colors, Inc. | [1]200103 | 418,935 |

[1] We use the shorthand "200103" to refer to the taxable year of Solomon Colors, Inc., ended on March 31, 2001.

With respect to Robert L. Solomon and Donna J. Solomon (collectively RDS) and Richard R. Solomon and Gina G. Solomon (collectively RGS), the deficiencies resulted from respondent's determination that Solomon Colors, Inc. (Solomon Colors or the corporation), had distributed undivided partial interests in a customer list (customer list) to Robert Solomon and Richard Solomon when it sold its Mather ore division to Prince Manufacturing Co. (Prince) in August 2000.  RDS and RGS (collectively the four Solomons) reported that Robert Solomon and Richard Solomon had each sold a "Customer List/Goodwill" directly to Prince.  Neither RDS nor RGS reported receiving interests in the customer list as a distribution from Solomon Colors.  With respect to Solomon Colors, the deficiency resulted from

respondent's determination that Solomon Colors had realized long-term capital gain under section 311(b) on its distribution of interests in the customer list to Robert Solomon and Richard Solomon. Solomon Colors did not report any such distributions to its shareholders.

After concessions and our dismissal for lack of jurisdiction of the portion of these cases requesting redetermination of overpayments determined by respondent as to the four Solomons for 2001, we decide whether to sustain petitioners' reporting positions as to the subject matter at hand. We shall not. Unless otherwise noted, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

1. Preface

Some facts were stipulated and are so found. When the petitions were filed, each of the four Solomons resided in Springfield, Illinois, and Solomon Colors had its principal place of business in that city as well.

Richard Solomon is the son of Robert Solomon. RDS and RGS are each husband and wife, and each couple filed a joint 2000 Federal income tax return. Solomon Colors filed its 2000 Federal corporate income tax return on the basis of a fiscal year ended on March 31, 2001.

2. <u>Solomon Colors</u>

Until 2000, Solomon Colors was in the business of pulverizing and selling Mather ore, a red iron oxide mined in the Upper Peninsula of Michigan. Solomon Colors transported natural crude ore from upper Michigan to Springfield, Illinois, and then dried, processed, and sold the product as an iron oxide to the foundry, fertilizer, and cement industries for use as a pigment. Solomon Colors processed the natural crude ore into fine ore using a machine known as a Raymond mill.

The business of Solomon Colors was originally conducted through a partnership, beginning in 1927. In 1982, Robert Solomon, Richard Solomon, and Robert Solomon's mother, Florence Solomon, were the only partners of that partnership. In 1982, those three individuals liquidated the partnership and caused its assets to be transferred to the contemporaneously formed Solomon Colors in exchange for all of its common stock. As part of this transaction, Solomon Colors assumed all of the partnership's liabilities. The transferred assets did not include any intangible asset. When Florence Solomon died, her shares in Solomon Colors were divided among the four Solomons. Each of the four Solomons was a director of Solomon Colors from 2000 through 2002. Robert Solomon was Solomon Colors' president and treasurer, Richard Solomon was Solomon Colors' vice president,

and Gina Solomon was Solomons Colors' secretary.[2]  Neither Robert Solomon nor Richard Solomon ever had an employment agreement with Solomon Colors.  An employee stock ownership plan (ESOP) owned approximately 35 to 40 percent of the stock of the corporation in 2000.[3]

Robert Solomon and Richard Solomon were responsible for managing the customer relationships with the purchasers of the corporation's Mather ore.  Robert Solomon began developing personal relationships with those customers in 1955, and Richard Solomon began developing such relationships in 1979.  Other employees ground and packaged the materials and prepared paperwork, but no one other than Robert Solomon or Richard Solomon regularly spoke with customers about the unique characteristics, grinding, packaging, or shipping of the iron oxide.

3.  Mather Ore Division

In 2000, the Mather ore division represented 7 percent of the sales of Solomon Colors.  At that time, Prince was the only other processor of Mather ore in the United States and Canada.[4]

---

[2] At the time of trial, Robert Solomon was the CEO of Solomon Colors and Richard Solomon was its president.

[3] At the time of trial, the ESOP owned approximately 52 percent of the stock.

[4] Alternatives to Mather ore were more expensive for customers to purchase.

Solomon Colors and Prince had some mutual customers, and the Mather ore produced by Solomon Colors originated from the same source and was essentially the same as that produced by Prince. Solomon Colors received a higher price for its product than did Prince.

Around 2000, the supplier of natural iron oxide ore that serviced both Solomon Colors and Prince had exhausted its stockpiles of mine mineral. Solomon Colors had to replace mine mineral with pond finds if it wanted to continue its Mather ore business. Solomon Colors determined that it would have to replace the Raymond mill with a different type of mill in order to process the pond finds. Solomon Colors determined that retooling the manufacturing process would cost $1.5 million.

4. Offer To Purchase Business

In May 2000, a salesman of Prince asked Richard Solomon whether Solomon Colors would sell its Mather ore business. Richard Solomon replied that he was interested and would have to discuss the matter with his father. When Richard Solomon and his father discussed selling the Mather ore business, Richard Solomon convinced his father to sell the Mather ore division and use the $1.5 million required to retool the manufacturing process on a new plant in California.

While Prince and Solomon Colors were negotiating the sale of the Mather ore division, the vice president and general manager

of Prince was Charles Davis.  Richard Solomon, Robert Solomon, and Charles Davis discussed the sale of the division over the course of approximately 1 month.  The initial discussions did not address the price and terms of the sale, any noncompete agreements for any of the family members, or a customer list.

5.  Term Sheet

On June 22, 2000, Charles Davis outlined the terms and conditions of the proposed sale in a term sheet.  The term sheet identified the parties to the sale as Prince and Solomon Colors. In a meeting that day, Robert Solomon and Charles Davis modified the term sheet to identify the subject of the sale as "The Prince Manufacturing Company's purchase of the Mather ore division of SGS Solomon Colors".  The modified term sheet identified a purchase price of $1.5 million and an agreement term of 5 years. The term sheet stated that Solomon Colors would transfer to Prince a Raymond mill with ancillary equipment and spare parts. The term sheet stated that Solomon Colors would purchase its color division's Mather ore requirements at a reduced price from Prince during the 5-year term of the agreement.  The term sheet required Solomon Colors to stop production of all Mather products and to stop resale of straight Mather-based products to certain customers for the 5-year term of the agreement plus an additional 5 years.

On June 23, 2000, Robert Solomon sent to Solomon Colors' outside counsel, Robert Walbaum, a facsimile to which the term sheet as modified was attached. The cover sheet included in this facsimile indicated that a customer list would be transferred as part of the transaction.

6. Negotiations and Initial Drafts

The first draft agreement (draft agreement) was prepared by Robert Walbaum and transmitted to Prince's outside counsel, John Stevenson, Jr. (John Stevenson), on June 30, 2000. The draft agreement identified the parties to the agreement as Solomon Colors and Prince and was titled "Agreement for Sale and Purchase of Raymond Mill". The draft agreement did not mention the transfer of any customer list to Prince. In the draft agreement, Robert Walbaum attributed the entire $1.5 million purchase price to the Raymond mill, although the equipment was worth only $100,000 at that time, because he was concerned that Solomon Colors' sale of its Mather ore division would violate antitrust laws.

On July 6, 2000, during an early morning teleconference among Robert Walbaum, Richard Solomon, and John Boxman (Solomon Colors' controller), Richard Solomon notified Robert Walbaum that Prince wanted to subject each of the four Solomons to covenants not to compete and to have each of the four Solomons sign the sale agreement in his or her individual capacity. Later that

day, Richard Solomon and Robert Walbaum spoke with Charles Davis and the representatives of Prince; namely, John Stevenson and his colleague, Delbert Mitchell. The Prince representatives indicated that Prince wanted to enter into covenants not to compete with each of the four Solomons. The participants in the call agreed that John Stevenson would revise the draft agreement to include the covenants not to compete and that John Stevenson would also prepare a supply agreement and a bill of sale. Pursuant to a teleconference later that day among the same five participants, Robert Walbaum wrote: "we will need to consider whether or not we can allocate income to the individuals for signing the non-compete which will be tax advantageous to do. If we can do so, then does the allocation need to be spelled out in the agreement."

Also on July 6, 2000, John Boxman sent a copy of the draft agreement to Thomas Bayer, Solomon Colors' independent accountant and the preparer of its tax returns. Thomas Bayer then sent an e-mail to Charles Bachman, counsel for the ESOP plan administrator, in which Thomas Bayer notified Charles Bachman that Solomon Colors was considering a sale of a product line and that the buyer was requesting some of the shareholders to sign noncompete agreements for which the buyer would compensate the shareholders. Thomas Bayer stated:

My question is this: Would this be a questionable transaction in terms of the ESOP participants perceiving this as trying to shelter the gain on this sale from the Company and from the ESOP? What is our risk here? I haven't completed my research, but I think we could take as much as 30% of the purchase price and allocate it to these non-competes with the shareholders personally.

In a memorandum written on July 7, 2000, Thomas Bayer stated:

Solomon was currently in the process of reengineering their [sic] process. At this point in time, the only property available to purchase is their [sic] customer list, because their [sic] process is worthless given the raw materials are not available.[5] * * *

With the above facts in mind, it is arguable that truly the only thing Prince is buying is "market share", with a guarantee that Solomon will not compete with them [sic] as an entity, and, the shareholders will not compete with them [sic] personally. The reason we provide this scenario is because the 2 cases which discuss the issues [sic] of personal goodwill involve a distributor of ice cream products and an accounting firm. Both of these entities rely heavily on the "salesmanship" and personal relationships created by their employees on an individual basis. When we look at Solomon, a manufacturer of products, our fact pattern changes drastically and as a practical matter, the "goodwill" that is created is arguably more at the entity level, notsomuch at the individual shareholder/employee level. However, the above fact pattern demonstrates that at this point in time, the only thing that Prince is really buying is the customer relationship, because of the drastic changes we described.

---

[5] Thomas Bayer uses the plural possessive pronoun "their" to refer to the assets and operations of the single corporation Solomon Colors. He also later on in this quotation refers to Price as "them".

7. <u>Initial Allocation of Purchase Price</u>

An initial allocation of purchase price among Solomon Colors and each of the four Solomons was structured by Robert Solomon in consultation with Thomas Bayer and John Boxman.  That allocation was not negotiated with Prince.  That allocation was as follows:

| Payee | Allocation |
|---|---|
| Solomon Colors | $880,000 |
| Robert Solomon | 425,000 |
| Richard Solomon | 145,000 |
| Donna Solomon | 25,000 |
| Gina Solomon | 25,000 |
| Total | 1,500,000 |

The undated document upon which the allocation appears includes the following handwritten comments: "Rich's Salary- be careful", "pay dividend", and "shred all drafts".

Subsequently, on July 17, 2000, Thomas Bayer sent an e-mail to John Boxman and an officer of Solomon Colors, stating that the purchase price for the customer list should be allocated evenly between Solomon Colors and Robert Solomon at $550,000 each (not including imputed interest).  Thomas Bayer explained that allocating any part of the purchase price for the customer list to Richard Solomon would undermine Solomon Colors' position in the event of an income tax audit.  Mr. Bayer stated:

> Our argument being that this product line is Bob
> Solomon's and the value for that line is with him.  We
> can justify reducing his salary because he has less
> worth to the business without this product line.
> Additionally, he is President of the Company and close
> to retirement so we can say that he is taking out of

the business what he needs, and, his salary when combined with the customer list sale was more than he needed- so we reduced his salary.

There is some subjectivity to this, but, we think we have come up with a reasonable allocation which will allow for tax savings and tax deferral.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Secondly, also remember that Bob should enter into a contractual agreement with the Company whereby if the IRS were successful in calling this a dividend, we would treat this as a bonus to Bob and then declare another bonus to him to allow him to pay the tax on his personal return.

At some point between July 11 and 20, 2000, Robert Walbaum prepared drafts of a covenant not to compete, a supply agreement, and a side agreement for the transaction.

## 8. Robert Solomon's Reduction in Salary

On July 17, 2000, John Boxman prepared a series of schedules reflecting cashflow data and amortization schedules. On July 18, 2000, John Boxman forwarded an e-mail to Richard Solomon to which was attached the following message written by John Boxman to Charles Bachman:

The monies that Bob Solomon receives will not affect the Company's financial position because he will forego salary during the five year period equaling approximately $575,000.

That means that $175,000 would effectively go outside of the Company.

To summarize, the Company will end up with $1,325,000 from this Transaction. This money is going to be used to open a manufacturing plant in California.

On July 19, 2000, Thomas Bayer represented to Charles Bachman that Robert Solomon would take a reduction in salary approximately equivalent to the amount of the sale proceeds allocated to Robert Solomon. Thomas Bayer stated that Solomon Colors would have a more positive cashflow if the proceeds from the sale were diverted to Robert Solomon. He further explained his rationale as follows:

> So under our scenario that we have laid out here, if his salary is reduced by $500k over the next 5 years, that is 500k of positive cash flow for the Company. Alternatively, if we assume that the Company receives that $500k for the customer list, they have to pay taxes on that entire amount this year (even though they will be paid for it on installments) at a combined state and federal rate of around 40% - so net of taxes, they will have cash flow of $300k. Initially, they would have negative cash flow because they have to pay taxes on the $500k before they receive the money. So the Company actually gets a $200K benefit from doing it this way.

On July 20, 2000, Charles Bachman wrote the following handwritten notes pursuant to a teleconference with John Boxman and other participants:

> They are doing some creative tax planning by diverting some of the proceeds to the shareholders. The [sic] project that this will have a positive affect [sic] on the financial statements of the Company which will increase the value of Solomon Company stock.

The following table shows the annual salary and bonus for Robert Solomon approved by the board of directors for each of Solomon Colors' fiscal years ended in 1996 through 2004:

| Fiscal Year | Salary | Bonus | Total |
|-------------|--------|-------|-------|
| 1996 | $71,212 | $96,400 | $169,608 |
| 1997 | 76,500 | 128,485 | 206,982 |
| 1998 | 88,000 | 59,720 | 149,718 |
| 1999 | 88,000 | 77,755 | 167,754 |
| 2000 | 88,000 | 83,500 | 173,500 |
| 2001 | 155,000 | 19,300 | 176,301 |
| 2002 | 155,000 | 16,280 | 173,282 |
| 2003 | 155,000 | 16,500 | 173,503 |
| 2004 | 155,000 | -0- | 155,000 |

Solomon Colors paid the following wages and nonemployee compensation to Robert Solomon during the 2000 through 2005 calendar years:[6]

| Calendar Year | Wages | Nonemployee Compensation |
|---------------|-------|--------------------------|
| 2000 | $238,500 | $1,800 |
| 2001 | 174,300 | 1,800 |
| 2002 | 171,280 | -0- |
| 2003 | 184,989 | -0- |
| 2004 | 301,968 | -0- |
| 2005 | 310,626 | 1,800 |

9.  Agreement

On August 4, 2000, the board of directors of Solomon Colors consented in writing to a sale of the Mather ore business to Prince for $100,000, payable upon execution of the sale.  That sale occurred on or about August 7, 2000.  Also on August 7, 2000, Solomon Colors, Prince, and each of the four Solomons entered into an Agreement for the Purchase and Sale of Covenant

_____

[6] We note that the annual salary and bonus for Robert Solomon approved by the board do not appear to coincide with the amounts paid to Robert Solomon during the 2000 through 2005 calendar years.  The record does not permit us to explain the discrepancy.

Not to Compete (agreement).  The terms of the agreement stated that Solomon Colors and the individual signatories would not compete with Prince in the Mather ore business and that Solomon Colors would sell to Prince its natural iron oxide ore customer list all in exchange for Prince's payment of $1.4 million.

Paragraph 1, Non-compete Covenant, of the agreement stated:

> On September 15, 2000, Solomon shall deliver to Prince Solomon's list of Mather ore natural iron oxide customers with the exception of cementious color customers.  Solomon shall keep such list confidential and not disclose such list to any other person throughout the terms [sic] of this Agreement.

Paragraph 2 of the agreement, Consideration for Covenant, stated:

> the consideration shall be allocated between and shall be payable to the Solomon Parties in the proportions, at the addresses upon the dates and otherwise in accordance with the schedules set forth in Exhibit "A".

Exhibit A, labeled "Prince sale Payment Schedule" (payment schedule), allocated the $1.4 million purchase price as follows:

| Payee | Covenant Not To Compete | Customer List |
|---|---|---|
| Solomon Colors | $150,000 | $550,000 |
| Robert Solomon | 25,000 | 500,000 |
| Richard Solomon | 25,000 | 140,000 |
| Donna Solomon | 5,000 | -0- |
| Gina Solomon | 5,000 | -0- |
| Total | 210,000 | 1,190,000 |

Fifty thousand dollars of the $1.4 million was stated in the exhibit to be paid upon execution of the agreement (as well as the $100,000 for the Raymond mill), and the $1.35 million balance was stated to be payable in quarterly installments over a 5-year

period beginning on October 1, 2000, and ending on April 1, 2005. The quarterly installments equaled $150,000 on each July 1 and $50,000 on each October 1, January 1, and April 1. The $1.4 million was stated in the exhibit to be inclusive of interest calculated at a rate of 9 percent per annum.

Paragraph 3 of the agreement, titled "Bargained for Provisions", stated as follows: "The parties hereto hereby expressly acknowledge that the restrictions imposed by this Agreement have been fully bargained for." Paragraph 4 stated that "The Solomon parties acknowledge that the breach of the terms of this Agreement by any of the Solomon Parties may render irreparable harm to Prince." The obligations of Prince under the agreement were guaranteed by its holding company, Philipp Brothers Chemicals, Inc.

10. <u>Side Agreement</u>

Also on August 7, 2000, Prince and Solomon Colors entered into a side agreement (side agreement) which incorporated the agreement by reference. The side agreement identified the parties as Solomon Colors and each of the four Solomons, but had signature blocks for only Solomon Colors and Prince and did not require any action or inaction on the part of any of the four Solomons. Robert Solomon signed the side agreement in his capacity as president of Solomon Colors. None of the four Solomons signed the agreement in his or her personal capacity.

The side agreement included material provisions of the transaction, including: (1) Purchase and Sale of the Raymond mill; (2) Transition Period; and (3) Miscellaneous provisions. Section 2 of the side agreement, titled "Transition Period", states:

> During the period between the date hereof and August 14, 2000, Solomon and Prince shall work together to form a plan for smooth transition of production and to ensure an adequate supply of inventory is available for all Mather markets. On August 14, 2000, Solomon shall notify its customers for Mather ore natural iron oxide with the exception of cementious color customers that it is exiting the business effective September 15, 2000, and refer such customers to Prince.

11. Transition between the Businesses

On August 14, 2000, Robert Solomon, in his capacity as president of Solomon Colors, sent out letters notifying all customers of Solomon Colors' Mather ore business that Prince would be taking over the milling of hematite iron ore. Richard Solomon, at the expense of Solomon Colors, later traveled to Atlanta, Georgia, to meet with customers concerned about the transition. Prince acquired all of Solomon Colors' former customers.

12. Customer List

A list of Mather ore customers was drafted on the stationery of Solomon Colors for the purpose of handing the list over to Prince after the sale of the Mather ore division to Prince. Before the sale, the names of the Solomon Colors customers were

not written on such a list. The list included the names and locations of 24 customers. Some of the listed customers became affiliated with Solomon Colors after the date of its incorporation. Of these customers, some were important in terms of the volume of the business; in 2000, approximately 40 percent of the business of Solomon Colors' Mather ore division was attributable to these customers.

13. Income Tax Returns

Solomon Colors' Federal income tax return for its taxable year ended in 2001 reported income of $562,301 from the installment sale of the Mather ore business. That income was inclusive of proceeds for the sale of the Raymond mill and proceeds attributable to the noncompete agreement.

RDS's 2000 Federal income tax return reported $10,147 of interest income and $44,853 long-term capital gain with respect to "Customer List/Goodwill". RDS also reported $5,000 of ordinary income that Robert Solomon received for his covenant not to compete and $1,000 of ordinary income that Donna Solomon received for her covenant not to compete.

RGS's 2000 Federal income tax return reported $2,704 of interest income and $20,296 long-term capital gain with respect to "Customer List/Goodwill". RGS reported $5,000 of ordinary income that Richard Solomon received for his covenant not to

compete and $1,000 of ordinary income that Gina Solomon received for her covenant not to compete.

## OPINION[7]

Respondent determined that Solomon Colors distributed partial interests in its customer list to Robert Solomon and Richard Solomon simultaneously with its execution of the agreement and, hence, Robert Solomon and Richard Solomon realized dividend income to the extent of the distributed property's fair market value.[8]  Under section 301(c)(1), a distribution of property from a corporation to a shareholder is generally taxed as a dividend to the extent of the corporation's current or accumulated earnings and profits.  As support for this determination, respondent observes that the agreement lists Solomon Colors as the seller of the customer list but that Robert Solomon and Richard Solomon were entitled to receive proceeds in connection with the sale.

---

[7] The Court's online database of opinions includes all of the Court's division and memorandum opinions filed after Sept. 24, 1995.  Where our opinion expressed herein includes a citation to an opinion included in that database, we have provided a hyperlink to that case.

[8] Respondent states in brief that petitioners could have structured the transaction as a sale by Solomon Colors of the entire customer list and a subsequent distribution to the shareholders of a portion of the cash proceeds, which would have been taxable to the shareholders under sec. 301.  Respondent does not further address this hypothetical scenario, and neither do we.

Petitioners argue that Solomon Colors did not distribute any interest in its customer list to its shareholders. Petitioners assert that a portion of the asset labeled "Customer List" in the agreement represented the customer relationships and goodwill belonging personally to Robert Solomon and Richard Solomon and that it was their portion that was sold directly to Prince by Robert Solomon and Richard Solomon. Petitioners assert that Prince was primarily interested not in the purchase of the customer list but in purchasing the assurances of Robert Solomon and Richard Solomon that they would maintain the customer base of Solomon Colors' Mather ore division immediately after Prince acquired the division. Petitioners assert that Prince already knew most if not all of the names on Solomon Colors' customer list and that the list was therefore of little to no value to Prince. Petitioners assert that neither Robert Solomon nor Richard Solomon ever transferred customer names or personal goodwill to Solomon Colors.

We find on the basis of the credible evidence in the record that Solomon Colors received $550,000 in exchange for the customer list and $150,000 for the company's covenant not to compete with Prince, both as stated in the payment schedule. We also find that, contrary to the allocation in the payment schedule, neither Robert Solomon nor Richard Solomon received anything for the sale of the customer list but received their

total allocated proceeds of $525,000 and $165,000, respectively, in exchange for their covenants not to compete with Prince.  We make both of these findings on the basis of the record at hand and without regard to which party bears the burden of proof.

We begin our analysis with our review of the agreement and the side agreement.  First, the agreement references a customer list owned by Solomon Colors alone.  The agreement states that Solomon Colors shall deliver its customer list to Prince and that Solomon Colors shall not disclose the names on the list throughout the term of the agreement.  The agreement makes no specific reference to any customer list belonging to Robert Solomon or Richard Solomon, nor does it preclude any disclosure of the names on the list by those individuals in their personal capacities independent of their obligations as officers of Solomon Colors.  The agreement does state, however, that neither Solomon Colors nor any of the four Solomons shall compete with Prince in the Mather ore business.[9]  Second, the side agreement states that Solomon Colors and Prince shall work together after the sale of the Mather ore division to form a plan for the smooth transition of production and that Solomon Colors shall refer its customers of the division to Prince.  The side agreement requires

_____

[9] Neither party asserts that the covenants not to compete are worthless because they are unenforceable under applicable State law.  We, like the parties, accept that the agreements are enforceable.

nothing of either Robert Solomon or Richard Solomon in their personal capacities independent of their duties as officers of Solomon Colors. We conclude from the agreement and the side agreement that, contrary to respondent's determination, neither Richard Solomon nor Robert Solomon sold any portion of Solomon Colors' customer list (or any customer list for that matter) to Prince as part of the relevant sale and that the proceeds of the sale allocable to Robert Solomon and Richard Solomon actually correspond to the only consideration contractually given by each; i.e., their respective covenants not to compete. We conclude similarly that the proceeds of the sale allocable to Solomon Colors correspond to the consideration contractually given by the company; i.e., the company's covenant not to compete and its customer list.

We find further support for our conclusions in other key facts of this case. After Prince acquired the Mather ore division from Solomon Colors, Prince was left as the sole business in the industry. Prince thus did not need the goodwill of Solomon Colors or any of its key employees to succeed; in fact, after the acquisition Prince continued to do business under its own name, not under the name of Solomon Colors. See Wilson Athletic Goods Manufacturing Co. v. Commissioner, 222 F.2d 355 (7th Cir. 1955), revg. T.C. Memo. 1954-163. After the acquisition, however, Prince did need the promises of Solomon

Colors and each of the four Solomons that they would not compete with Prince in the Mather ore industry for a desired period of time. Prince was therefore required to compensate those persons for their promises not to compete with Prince in the Mather ore industry. Indeed, it was the representatives of Prince who first indicated and insisted that Prince would require a noncompete agreement from Solomon Colors and each of the four Solomons as a condition to the sale. The noncompete agreement was professionally prepared and its provisions, in accordance with its terms, were fully bargained for. The agreement acknowledged that the breach of its terms by any of the four Solomons may render "irreparable harm" to Prince. For its part, Prince assured the performance of its obligations through the guaranty of its holding company. Thus, we find that the noncompete agreement was of substantial value to Prince.

By contrast, Prince never required that any of the purchase price be allocated to the customer list; given that Prince was the sole supplier of Mather ore following the sale and at that time directly knew the names of all of Solomon Colors' customers, the customer list was of little, if any, value to Prince.[10] The mere fact that exhibit A to the agreement states that Robert

---

[10] Respondent does not challenge the taxability of the $550,000 allocated by petitioners as Solomon Colors' share of the proceeds from the sale of the customer list. Accordingly, neither do we.

Solomon and Richard Solomon were compensated for their sale of the customer list does not mean that we have to respect that statement.[11] See Garcia v. Commissioner, 80 T.C. 491, 498 (1983) (citing Commissioner v. Court Holding Co., 324 U.S. 331 (1945)). Under the facts herein, we decline to respect that statement because we conclude it is inaccurate. Neither Robert Solomon nor Richard Solomon possessed an interest in the customer list worth the value which was ascribed to it in the agreement.[12]

---

[11] Prince, for its part, was likely indifferent to the allocation of the consideration as between the covenant not to compete and goodwill because sec. 197 would mandate a writeoff of no faster than 15 years in any event. See Frontier Chevrolet Co. v. Commissioner, 116 T.C. 289 (2001), affd. 329 F.3d 1131 (9th Cir. 2003).

[12] In addition to the foregoing, we note that the initial draft of the sales agreement, i.e., the draft agreement, was prepared by the outside counsel for Solomon Colors and made no mention of a customer list or any covenant not to compete. It was in reply to the draft agreement that Prince first insisted that the agreement include the covenants of each of the four Solomons not to compete with Prince in the relevant industry and that those covenants be given by each of the four Solomons in an individual capacity rather than in his or her capacity as an officer or employee of Solomon Colors. Solomon Colors then responded that the four Solomons should personally receive some of the purchase price in exchange for their covenants not to compete. Shortly thereafter, Thomas Bayer, the independent accountant of Solomon Colors, hypothesized that Prince was simply buying Solomon Colors' "market share" and the guaranties of the corporation and of each of the four Solomons not to compete with Prince in the industry underlying that share. Bayer also noted that Solomon Colors owned a customer list in its own right and suggested that any "goodwill" related to the sale was that of the corporation rather than any or all of the four Solomons. Lastly, when the agreement was finalized, it conformed to Prince's desire that Prince purchase the Mather ore division of Solomon Colors from Solomon Colors and that Prince receive from the corporation
(continued...)

Petitioners argue as to Robert Solomon and Richard Solomon that the proceeds allocated to the customer list actually compensated them for agreeing to maintain Solomon Colors' customer base following the sale. We disagree. This requirement to maintain the customer base was set forth in the side agreement, and neither of those individuals signed this agreement in his personal capacity.[13] Moreover, Prince, following the sale, was the only business operating in the Mather ore industry. Thus, the former customers of Solomon Colors, most if not all of whom were known to Prince at the time of the sale, had to become customers of Prince if they wanted to continue as customers in that industry. The credible evidence at hand establishes to our satisfaction that Prince was not primarily interested in purchasing the personal assurances of Robert Solomon and Richard Solomon that they would maintain the customer base of Solomon Colors' Mather ore division, as petitioners assert. The evidence establishes, and we find as a fact, that Prince was interested in eliminating Solomon Colors from the relevant industry and

---

[12](...continued)
and each of the four Solomons covenants not to compete with Prince in the relevant industry. Although the agreement did refer to a customer list owned by Solomon Colors, that list, as discussed herein, was of little to no value to Prince.

[13] The agreement, on the other hand, makes no mention of "customer relationships".

assuring itself that neither Robert Solomon nor Richard Solomon could reenter the industry through a different form.

Petitioners rely on Martin Ice Cream Co. v. Commissioner, 110 T.C. 189 (1998), to support their assertion that Robert Solomon and Richard Solomon sold their personal goodwill to Prince as part of the agreement.  There, the founder of Häagen-Dazs asked Arnold Strassberg (Strassberg) to use his ice cream marketing expertise and relationships with supermarket owners and managers to introduce Häagen-Dazs ice cream products into supermarkets because Häagen-Dazs had made only minimal inroads into supermarkets with its new range of "super-premium" ice cream products.  Strassberg was the controlling shareholder of Martin Ice Cream Co., an ice cream distributing company.  The founder of Häagen-Dazs ultimately purchased the company's intangibles 14 years later, at which time he viewed Strassberg as "a high-profit, well-respected ice cream distributor * * *[with] various relationships personal to [him]."  We held that the goodwill attributable to Strassberg's business relationships belonged to Strassberg in his individual capacity and was not an asset of Martin Ice Cream Co.  We found that the success of the ice cream distribution venture depended entirely upon Strassberg and that the company's value in the market was attributable to Strassberg's personal services and relationships.

The Martin Ice Cream case is distinguishable from this case. First, the record does not persuade us, nor do we find as a fact, that the value of Solomon Colors in the market was attributable to the quality of service and customer relationships developed by Robert Solomon or Richard Solomon. Rather, the record reflects our finding that Solomon Colors, as a business of processing, manufacturing, and sale, rather than one of personal services, did not depend entirely on the goodwill of its employees for its success. See Schilbach v. Commissioner, T.C. Memo. 1991-556; cf. Longo v. Commissioner, T.C. Memo. 1968-217. Second, unlike the founder of Häagen-Dazs in Martin Ice Cream, who signed an agreement with Strassberg in his personal capacity, Robert Solomon and Richard Solomon were not named as the sellers of any asset but were included in the sale in their individual capacities solely to guarantee that they would not compete with Prince. Third, the fact that Prince required noncompete agreements, but not employment or consulting agreements, of Robert Solomon and Richard Solomon makes it unlikely that Prince was purchasing the personal goodwill of these individuals.

We hold that the $500,000 and $140,000 that petitioners allocated to Robert Solomon's and Richard Solomon's sale of a customer list is actually attributable to their covenants not to compete. All arguments for a contrary holding have been

considered, and we reject those arguments not discussed herein as irrelevant or without merit.  Accordingly,

<u>Decisions will be entered under Rule 155</u>.